IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PATRICIA MCSPARRAN,          :
        Plaintiff            :
                             :
    v.                       :   CIVIL NO. 1:13-CV-1932
                             :
COMMONWEALTH OF              :
PENNSYLVANIA, PENNSYLVANIA   :       (Judge Caldwell)
DEPARTMENT OF                :
ENVIRONMENTAL PROTECTION,    :
KELLY HEFFNER, and JEFFREY   :
LOGAN,                       :
        Defendants           :

*M E M O R A N D U M*

I.   *Introduction and Procedural History*

Plaintiff is Patricia McSparran.  Defendants are the Commonwealth of

Pennsylvania (the Commonwealth); the Pennsylvania Department of Environmental

Protection (the DEP); Kelly Heffner, the DEP's Deputy Secretary for Water Management;

and Jeffrey Logan, the DEP's Executive Deputy Secretary for Management and

Administration.

Plaintiff was formerly the DEP's Director of the Bureau of Waterways

Engineering and Wetlands.  She brought this suit alleging she was given unequal pay,

subjected to harassment and then fired from her job, all on the basis of her sex.  She

made the following claims: (1) a 42 U.S.C. § 1983 claim based on her federal right to

equal protection; (2) a section 1983 claim based on her federal right to due process; (3) a

claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*; (4) a

claim under the Pennsylvania Human Relations Act (PHRA), 43 Pa. Stat. Ann. §§ 951 *et seq.*; (5) a state-law claim for defamation; and (6) a state-law claim for intentional infliction of emotional distress.

Defendants filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  We granted that motion.  We dismissed the due-process claim and the state-law claim for intentional infliction of emotional distress without leave to amend.  We gave Plaintiff an opportunity to amend her Complaint to set forth her other claims with greater factual support.  *McSparran v. Pennsylvania*, 2013 WL 6631654, at *10 (M.D. Pa. Dec. 17, 2013).

Plaintiff has filed an Amended Complaint, reiterating her equal-protection claim, her Title VII claim, her PHRA claim and her defamation claim.  We are considering Defendants' motion to dismiss that pleading.

II.   *Standard of Review*

On a Rule 12(b)(6) motion, "[w]e 'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Byers v. Intuit, Inc.*, 600 F.3d 286, 291 (3d Cir. 2010)(quoted case omitted).

A complaint need only contain "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), and detailed factual allegations are not required.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007). Nonetheless, a complaint has to plead "enough facts to state a claim to relief that is

plausible on its face." *Id.* at 570, 127 S.Ct. at 1974. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)(quoting *Twombly*, 550 U.S. at 556, 127 S.Ct. at 1965). "[L]abels and conclusions" are not enough, *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1964-65, and a court "'is not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id.*, 127 S.Ct. at 1965 (quoted case omitted).

The court is not limited to evaluating the complaint alone; it can also consider documents attached to the complaint, matters of public record, and indisputably authentic documents. *Delaware Nation v. Pennsylvania*, 446 F.3d 410, 413 n.2 (3d Cir. 2006).

The Third Circuit has described the Rule 12(b)(6) inquiry as a three-part process:

> First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013)(quoted cases omitted). This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679, 127 S.Ct. at 1950.

With this standard in mind, we set forth the background to this litigation, as Plaintiff alleges it in her Amended Complaint.[1]

III.   *Background*

Plaintiff is a member of a protected class based on her gender.  (Doc. 18, Am. Compl. ¶ 11).  She is "highly educated, experienced and accomplished in the field of environmental protection" with a Bachelor of Science in Civil Engineering and a Master of Science in Civil Engineering.  (*Id.* ¶ 12).  Before she worked for the Commonwealth, Plaintiff was a Water Resources Engineer for the Delaware River Basin Commission and an engineer for a private company doing environmental consulting.  (*Id.*).

"On or about March 15, 2004, Plaintiff was hired as an Executive Assistant for the DEP in the Office of Water Management."  (*Id.* ¶ 13).  As an executive assistant, "Plaintiff performed all duties related to operations, oversight, policy, legislation and management of the Water Management Deputate including acting as the Deputy Secretary's alternate when she was unavailable."  (*Id.* and Am. Compl. Ex. A, Job Description).

Almost two years later, on June 9, 2006, she "was promoted through the competitive process to Director of the Bureau of Waterways Engineering "[a]s a result of a national search and committee decision."  (*Id.* ¶ 14 and Am. Compl., Ex. B).  At that time, the then Deputy Secretary of Water Management and Plaintiff's immediate supervisor,

---

[1]  Parenthetically, we note that the Third Circuit has stated that the *Twombly* plausibility standard applies to employment-discrimination cases.  *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

Cathleen Curran Myers, wrote: "With a strong background in engineering and water management programs, Ms. McSparran is well qualified to assume the responsibilities of this position." (*Id.* and Am. Compl., Ex. B). "Except for her final weeks of employment, Plaintiff was the sole female Bureau Director in Water Management of DEP." (*Id.* ¶ 15).

During her employment Plaintiff was subjected to "disparate treatment on the basis of her gender/sex." (Doc. 18, Am. Compl. ¶ 16). "Plaintiff was treated differently than the other male bureau directors who were similarly situated and had similar responsibilities and/or authority within the department and [who] reported to the same supervisor . . . ." (*Id.* ¶ 17).

Plaintiff complained to her supervisor, Cathleen Curran Myers, then the Deputy Secretary of Water Management, "that her salary was less than her male counterparts," at that time "John Hines, Stuart Gansell, and Fred Marrocco." (*Id.* ¶¶ 14 and 18). "Plaintiff was similarly situated at the same pay grade as John Hines and Stuart Gansell." (*Id.* ¶ 18). "The Bureau Directors similar to Plaintiff had comparable authority and likewise reported to Cathleen Myers." (*Id.*).

"To minimize the disparity in salary compared to her male counterparts," and to recognize "her exemplary performance with increased responsibilities" on July 3, 2007, Myers awarded Plaintiff "an exceptional pay increase of two (2) steps." (*Id.* ¶ 20, Am. Compl., Ex. D, exceptional pay increase request).[2]

---

[2] We note that in the exceptional pay increase request, Myers does not list as a reason for the request that Myers wanted to minimize the salary disparity with Plaintiff's male counterparts. It also appears from the request that it was granted on January 3, 2007, not July 3, 2007.

In recommending Plaintiff for the pay increase, Myers wrote: Plaintiff's "problem solving experience and leadership abilities . . . greatly served the Bureau"; Plaintiff "enhanced existing as well as implemented new initiatives"; Plaintiff "demonstrated excellence in communicating with the public in response issues in the Delaware River Basin related to the new York reservoirs"; and Plaintiff's efforts in that regard "helped to spawn an integrated study related to the flooding and reservoirs." (*Id.* ¶ 19 and Am. Compl., Ex. D).

Nonetheless, the "exceptional pay increase did not equalize the pay disparity." (*Id.* ¶ 21).  "Plaintiff was denied equal wages earned by similarly situated male directors," at the time, "John Hines and Stuart Gansell." (*Id.*).  Hines "supervised a smaller office than the Plaintiff," and Gansell "had about the same size bureau as Plaintiff." (*Id.*).  When Gansell was replaced by Cedric Karper, Karper "earned more than the Plaintiff despite less seniority in the position of Bureau Director." (Doc. 18, Am. Compl. ¶ 21(a)).  When Karper retired and was replaced by Hines as acting bureau director, Hines "earned more than the Plaintiff performing the comparable bureau director duties for Watershed Management." (*Id.*, ¶ 21(b)).  When Glenn Rider was bureau director, Rider "earned more than Plaintiff when Rider "had less seniority as a bureau director compared to Plaintiff." (*Id.* ¶ 21(c)).

In 2009, John Hines was promoted, replacing Myers as Deputy Secretary of Water Management.  (*Id.* ¶ 22).  Hines supervised Plaintiff from 2009 through January 2011.  (*Id.* ¶ 23).  During this time, Plaintiff complained to Hines that "he favored the male

bureau directors." (*Id.*).  Under Hines, male bureau directors Glenn Rider and Dana

Aunkst "received higher wages for performing comparable director duties." (*Id.*).  Hines

"repeatedly placed the male directors in charge of the Deputate in his absence despite

Plaintiff was the most senior Bureau Director," and Hines "would put his male executive

assistant in charge if the male bureau directors were unavailable, deliberately excluding

the plaintiff despite her availability." (*Id.*).  Hines "refused to act on her complaints of

disparate treatment," responding, 'Do not go there.'" (*Id.* ¶ 24).

Further, "Hines subjected Plaintiff to sexual harassment including

unwelcome touching, leering and sexual advances and innuendos that Plaintiff repeatedly

rejected." (*Id.* ¶ 25).

In January 2011, Hines was "again promoted," (*id.*, ¶ 26), and Michael L.

Krancer was appointed Acting Secretary.  (*Id.* ¶ 27).  In an e-mail, dated February 16,

2011, Krancer thanked Plaintiff and another employee for their "terrific briefing paper on

the H20 program and the two Montco projects" and said he appreciated their

"workmanlike efforts." (*Id.* ¶ 27, and Am. Compl., Ex. E).  In an e-mail, dated February

18, 2011, Krancer thanked Plaintiff for information she supplied about a particular project,

saying "it [was] exactly what I was looking for." (*Id.*).

In June 2011, defendant Kelly Heffner, a female, was promoted to the

position of Deputy Secretary of Water Management, and became Plaintiff's direct

supervisor.  (Am. Compl. ¶ 28).  "Plaintiff complained on multiple occasions to Defendant

Heffner that Plaintiff was denied equal wages and unequal work conditions compared to

the preferential treatment accorded Glenn Rider, then a similarly situated male director with comparable job duties, authority and same supervisor." (*Id.* ¶ 29).

In response, and unlike the treatment given to Rider, "Defendant Heffner shunned the female plaintiff and precluded her from business communication, information and meetings." (*Id.*, ¶ 30).  More specifically, Heffner "regularly cancelled one-on-one meetings, failed to respond to Plaintiff's email inquiries for business information, clarification and instruction, and failed to communicate with Plaintiff by phone or in-person instead communicating with the Male Bureau Director Glenn Rider and other male staff." (*Id.*).  Also, "Heffner approved Glenn Rider's request for an extension of time to complete a two (2) year strategic plan BUT refused to approve Plaintiff's exact request for an extension for the same reasons provided by Glenn Rider." (*Id.*)(emphasis in original). Additionally, Heffner "deliberately overlooked the female plaintiff Bureau Director and placed the males as her alternate when Defendant Heffner was out of the office. Defendant Heffner placed Glenn Rider as her alternate and otherwise placed her lesser male Executive Assistant Duke Adams in charge despite Plaintiff's availability." (*Id.* ¶ 31, and Am. Compl., Ex. F).

Heffner "published falsehoods to Director of State Employment and staff of Water Management Deputate and staff of Field Operations Deputate and Executive Staff about the plaintiff alleging that she was not adhering to Heffner's supervisory directives and unwilling to comply with Administrative goals." (*Id.* ¶ 32).

Additionally, Defendant Heffner "circumvented the 'chain of command' and deliberately communicated with her subordinate staff to keep the plaintiff out of the loop and in the dark on policy changes and implementations." (*Id.* ¶ 33). "On occasion she invited male Jeffrey Means, then not associated with Water Management, instead of the plaintiff to internal meetings that he had no business or reason" to attend. (*Id.*).

Heffner "invited Plaintiff's subordinate male section chiefs to meetings on high level capital budget issues and addressed questions and discussions with them instead of directing the questions and discussion to the Plaintiff" when "[t]he subordinate male section chiefs had NO business necessity to be at the meeting, NO involvement in the budget, NO knowledge of the budgetary process, and NO authority on the subject." (Doc. 18, Am. Compl. ¶ 33(a))(emphasis in original). "They were unable to answer the questions yet Defendant Heffner refused to acknowledge the Plaintiff's presence, authority and ability to provide the information and necessity to discuss the issues relevant to her management of her Bureau. Defendant Heffner publicly humiliated the plaintiff and disgraced her in front of her subordinate staff." (*Id.*).

"Heffner precluded the plaintiff from critical business meetings with Secretary of DEP, executive staff, and Governor's office relative to Plaintiff's programs." (*Id.*, ¶ 33(b)). "Plaintiff's absence from critical meetings with other agencies related to Plaintiff's programs was noticed by outside federal agencies including Natural Resources Conservation Service and by the executive staff of Pennsylvania Department of General

Services that falsely implied Plaintiff's lack of competency and diminished professional reputation and expertise." (*Id.* ¶ 34).

During the time Heffner was Plaintiff's supervisor, Heffner did not prepare and present a performance review of Plaintiff. (*Id.* ¶ 36). It was Hines who did her last performance evaluation, dated January 14, 2011. (*Id.* ¶ 35). Hines rated Plaintiff as exceeding expectations on her management skills and described her as a "dedicated manager who is astute in understanding key details on issues as well as having the ability to shift out key issues for decisions." (*Id.*, and Am. Compl., Ex. G).

"Heffner deliberately precluded Plaintiff from the internal post-recovery task force following the flood of 2011 despite her experience and demonstrated expertise in flood recovery through the flood protection program in her Bureau." (*Id.* ¶ 39).

Plaintiff avers that she continued with her excellent work, as evidenced by e-mails. (*Id.* ¶ 38). On January 10, 2012, an official with a state senator e-mailed to thank her for help she was giving on a certain project. (*Id.*, and Am. Compl., Ex. I). On March 20, 2012, a DEP official e-mailed to thank her for her participation in a meeting. (*Id.*). On April 3, 2012, a federal official thanked Plaintiff for her "assistance on granting emergency permit clearance for the EWP projects," related to post-flood recovery. (Doc. 18, Am. Compl. ¶ 39(a), and Am. Compl., Ex. J).

However, two days later, on April 5, 2013, "without notice or warning, HR Director Aimee Brough presented the termination letter to Plaintiff stating and notifying her that she was involuntarily separated because her services 'were no longer required.'"

(*Id.* ¶ 40, and Am. Compl., Ex. K).  Plaintiff asked if she was being fired for cause, and

Ms. Brough "responded 'no' and she reread the termination letter emphasizing 'services

no longer required.'"  (*Id.* ¶ 41, and Am. Compl., Ex. L).  "The termination decision was

made by Defendant Heffner and Defendant Logan."  (*Id.* ¶ 48, and Am. Compl., Ex. M).

Plaintiff had not been warned about any performance issues while she was employed.

(*Id.* ¶ 56).  Hines participated in the decision to fire Plaintiff and acted to harm her to

retaliate against her for rejecting his advances.  (*Id.* ¶ 71).

Plaintiff was replaced by "a less qualified male," Jeffrey Means.  (*Id.* ¶¶ 42

and 50).  Means had previously been demoted from the position of bureau director at

another deputate which was much smaller in size and responsibility than the Bureau of

Waterways Engineering.  (Doc. 18, Am. Compl. 63(a)).  "Means does not have a master's

degree or equal education to Plaintiff."  (*Id.* ¶ 63(b)).  "Means did not have the proven

experience and knowledge in flood protection, stream improvement and dam safety

programs."  (*Id.* ¶ 63(c)).  And "Means did not have the background and work experience

in [the] Water Management Deputate" when he replaced Plaintiff.  (*Id.* ¶ 63(d)).

"Defendant Heffner admitted her sexual favoritism towards male employees

including Male Jeffrey Means."  (*Id.* ¶ 53, and Am. Compl., Ex. Q).  Heffner "engaged in a

pattern and practice of preferential treatment and sexual favoritism towards male

employees laced with solicitation and sexual interest based on their male gender."  (*Id.* ¶

57).  Heffner's sexual favoritism toward Means is supported by the fact that Means did not

have to compete for the position he took from Plaintiff; the position was not posted "and a

search was not performed contrary to usual practice and procedure." (*Id.* ¶ 52, and Am. Compl., Ex. P).  Additionally, Heffner had previously twice promoted Means to positions that were not advertised nor subject to typical Commonwealth hiring and promotion practices and procedures.  (*Id.* ¶ 58).  In these promotions, Heffner gave him "significantly higher raises and resulting salaries than the compensation guidelines provided [for] in stark contrast to the female plaintiff."  (*Id.*).

Heffner exhibited sexual favoritism toward another male, Duke Adams.  (*Id.* ¶ 59).  Heffner promoted him to executive assistant and gave him preferential treatment by letting him assume control of the office in Heffner's absence rather than Plaintiff.  (*Id.*)  Heffner exhibited sexual favoritism toward another male, Tom Bold.  (*Id.* ¶ 60).  Bold was two levels below Plaintiff and was her subordinate, but Heffner "invited Tom Bold to significant internal meetings with the Secretary of DEP and executive staff of DEP[,] excluding" Plaintiff.  (*Id.*).  Heffner gave Glenn Rider preferential treatment "as described above."  (*Id.* ¶ 61).

"Defendant Heffner deliberate[ly] orchestrated Plaintiff's separation[,] falsely accusing her of poor performance" so that she could be replaced by a male, Jeffrey Means.  (*Id.* ¶ 54, and Am. Compl., Ex. Q).

Beginning in November 2011, Heffner "acted to harm and defame" Plaintiff.  (*Id.* ¶ 54).  "Heffner published falsehoods about Plaintiff's work performance to tarnish her reputation and discharge her from employment."  (*Id.* ¶ 55, and Am. Compl., Exs. P, Q).  Specifically, Heffner "accused her of being insubordinate, not a team player, failing to

support the Administration and Agency staff, objectives and programs, fail[ing] to demonstrate leadership qualities, and 'go[ing] beyond accepted advocacy and staff.'" (*Id.*).  Both Heffner and Logan published these falsehoods.  (*Id.* ¶ 103).

"Defendant Logan admittedly relied [on] and accepted the falsehoods" and he "republished the falsehoods."  (*Id.* ¶ 67).  These falsehoods "were published to individuals that had no right to know," (*id.* ¶ 68 and 110), including "Field Operations Deputate, staff within the Water Management Deputate, Executive Staff of DEP, Governor's Office, Bureau of State Employment including but not limited to Melanie DePalma, colleagues through the Susquehanna River Basin Commission and other commissions, former colleagues including John Hines and attorneys that Plaintiff had worked with at DEP and outside of the department on environmental, Water Planning Office and staff at National Resources and Conservation Service and other federal agencies in contact with DEP."  (*Id.* ¶¶ 68 and 110).  The falsehoods caused Plaintiff "to lose her job, tarnish her reputation, and suffer harm and losses" including the foreclosure of other opportunities.  (*Id.* ¶¶ 70, 77, and 112).

IV.   *Discussion*

    A.  *The Equal Protection Claim, the Title VII Claim*
       *and the PHRA Claim*

The equal-protection claim, the Title VII claim and the PHRA claim are all decided using the same analysis.  *Wood v. University of Pittsburgh*, 395 F. App'x 810, 816 (3d Cir. 2010)(nonprecedential)("The showing required to prove a § 1983 gender

discrimination claim is identical to that required by Title VII."). *Id.* at 813 n.1 ("Our analysis of gender discrimination claims under the Pennsylvania Human Relations Act ("PHRA") is identical to our analysis under Title VII.").

In reviewing Defendant's motion to dismiss these claims, we thus need to analyze them only under the law that applies to one of these claims. We will use Title VII law, even though we used equal-protection law in analyzing the legal sufficiency of the original complaint. As we see it, the Amended Complaint makes five gender-discrimination claims under Title VII: (1) an equal pay claim; (2) a discharge claim; (3) a hostile work environment claim based on conduct of John Hines, who was once a supervisor of Plaintiff; (4) a hostile work environment based on the conduct of defendant Heffner; and (5) a retaliation claim based on Plaintiff's complaints about disparate treatment.

To establish a prima facie case of sex discrimination under Title VII, "[a] plaintiff must show that '1) s/he is a member of a protected class, 2) s/he was qualified for the position s/he sought to attain or retain, 3) s/he suffered an adverse employment action, and 4) the action occurred under circumstances that could give rise to an inference of intentional discrimination.'" *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 169 (3d Cir. 2013)(quoted case omitted).[3]

---

[3] Title VII provides:

> it shall be an unlawful employment practice for an employer --
> (1) to fail or refuse to hire or to discharge any individual, or
> otherwise to discriminate against any individual with respect to
> his compensation, terms, conditions, or privileges of

We look to the prima facie case because we must decide the motion to dismiss keeping the elements of the claim in mind. *Connelly, supra,* 706 F.3d at 212. At the same time, however, we must recognize that Plaintiff need not establish the prima facie case at the pleading stage, only make "'allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary element[s].'" *Groeber v. Friedman & Schuman, P.C.*, ___ F. App'x ___, ___, 2014 WL 542386 at *2 (3d Cir. 2014)(nonprecedential)(quoted case omitted).

In moving to dismiss the employment-discrimination claims, Defendants argue that Plaintiff's Amended Complaint fails to provide sufficient factual allegations to raise the inference that the conduct of Defendants was motivated by gender discrimination. They begin by noting that Kelly Heffner, Plaintiff's supervisor, against whom Plaintiff made numerous allegations of sex discrimination, and the person who made the decision to fire her, is herself a female. Defendants recognize that Heffner's gender is not dispositive but argue that it is relevant when considered with other factors. Second, since Plaintiff alleges that except for the final weeks of her employment, she was the sole female Bureau Director in Water Management, there was another woman at her level, which is inconsistent with her claim she was fired because of her sex. Third, the allegation that she was the "sole" female Bureau Director is not probative of sex discrimination when there are only three Bureau Director positions. Fourth, she does not

employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a)(1).

make sufficient allegations regarding the male comparators she alleges are similarly situated.  Specifically, her allegations indicate she considers seniority important for pay, but she does not allege whether the higher-paid males had more seniority than she.  Fifth, Plaintiff was given a two-step pay raise, accompanied by praise for her abilities, which is inconsistent with gender discrimination.  Defendants also argue the claims based on Hines's conduct are time-barred and that many of the actions alleged against Heffner do not constitute adverse action.

### 1.  *The Equal Pay Claim*

We will begin with the equal pay claim.  Defendants do not contest that Plaintiff has made sufficient allegations concerning  the first three elements of the claim. They do challenge whether Plaintiff has satisfied the fourth element, that she was paid less than the other bureau directors because of her gender.

To support this fourth element, Plaintiff made allegations concerning comparators, an accepted way of supporting an inference of discrimination in a Title VII disparate treatment claim.  *See Golod v. Bank of America Corp.*, 403 F. App'x 699, 702 n.2 (3d Cir. 2010)(nonprecedential).  Comparators are similarly situated employees who are not members of the plaintiff's protected class who were treated more favorably under similar  circumstances.  *Greene v. Virgin Islands Water & Power Auth.*, ___, F. App'x ___, ___, 2014 WL 523363 at *4 (3d Cir. 2014)(nonprecedential).

The following allegations are pertinent to that claim.  On June 9, 2006, Plaintiff was promoted to Director of the Bureau of Waterways Engineering by the then

Deputy Secretary of Water Management and Plaintiff's immediate supervisor, Cathleen Curran Myers.  (Am. Compl. ¶ 14 and Am. Compl., Ex. B).  "Except for her final weeks of employment, Plaintiff was the sole female Bureau Director in Water Management of DEP."  (*Id.* ¶ 15).  Plaintiff complained to Myers "that her salary was less than her male counterparts," at that time "John Hines, Stuart Gansell, and Fred Marrocco."  (*Id.* ¶¶ 14 and 18).  "Plaintiff was similarly situated at the same pay grade as John Hines and Stuart Gansell."  (*Id.* ¶ 18).  "The Bureau Directors similar to Plaintiff had comparable authority and likewise reported to Cathleen Myers."  (*Id.*).

To recognize "her exemplary performance with increased responsibilities" on July 3, 2007, Myers awarded Plaintiff "an exceptional pay increase of two (2) steps." (*Id.* ¶ 20, Am. Compl., Ex. D, exceptional pay increase request).[4]  In recommending Plaintiff for the pay increase, Myers praised Plaintiff's work.  (*Id.* ¶ 19 and Am. Compl., Ex. D).

Nonetheless, the "exceptional pay increase did not equalize the pay disparity."  (*Id.* ¶ 21).  "Plaintiff was denied equal wages earned by similarly situated male directors," at the time, "John Hines and Stuart Gansell."  (*Id.*).  Hines "supervised a smaller office than the Plaintiff," and Gansell "had about the same size bureau as Plaintiff."  (*Id.*).  When Gansell was replaced by Cedric Karper, Karper "earned more than

_____

[4]  Paragraph 20 also alleges that Myers wanted to minimize the salary disparity with Plaintiff's male counterparts.   However, the exceptional pay increase request does not list that as a reason for the request.  It also appears from the request that it was granted on January 3, 2007, not July 3, 2007.

-17-

the Plaintiff despite less seniority in the position of Bureau Director." (Doc. 18, Am. Compl. ¶ 21(a)). When Karper retired and was replaced by Hines as acting bureau director, Hines "earned more than the Plaintiff performing the comparable bureau director duties for Watershed Management." (*Id.*, ¶ 21(b)). When Glenn Rider was a bureau director, Rider "earned more than Plaintiff when Rider "had less seniority as a bureau director compared to Plaintiff." (*Id.* ¶ 21(c)).

In 2009, John Hines was promoted, replacing Myers as Deputy Secretary of Water Management. (*Id.* ¶ 22). Hines supervised Plaintiff from 2009 through January 2011. (*Id.* ¶ 23). Under Hines, male bureau directors Glenn Rider and Dana Aunkst "received higher wages for performing comparable director duties." (*Id.*).

In June 2011, defendant Heffner, became Deputy Secretary of Water Management and was Plaintiff's direct supervisor. (Am. Compl. ¶ 28). "Plaintiff complained on multiple occasions to Defendant Heffner that Plaintiff was denied equal wages and unequal work conditions compared to the preferential treatment accorded Glenn Rider, then a similarly situated male director with comparable job duties, authority and same supervisor." (*Id.* ¶ 29).

We believe these allegations are sufficient to state a claim of unequal pay based on gender. Essentially, they assert the following. There are three bureau director positions underneath the DEP's deputy secretary for water management. The other bureau directors had comparable authority to Plaintiff. Plaintiff did receive an exceptional pay increase, but it did not equalize the pay disparity. Two male bureau directors, John

Hines and Stuart Gansell, were in the same pay scale as Plaintiff but were paid more, even though Hines supervised a smaller office than the Plaintiff, and Gansell had about the same size bureau as Plaintiff.  When Gansell was replaced by the male Karper, Karper still earned more than Plaintiff although he had less seniority.  When Rider was a bureau director, he also earned more than Plaintiff although he had less seniority but was performing comparable director duties.  Dana Aunkst was another male who was paid more than Plaintiff for being a bureau director with comparable duties.

Defendants argue that Plaintiff does not make sufficient allegations concerning the male comparators, specifically that while she considers seniority relevant to her pay claim, she does not allege whether the higher-paid males had more seniority than she, an allegation that would explain the disparity on a non-gender basis.  We disagree.  We think the other comparator allegations are sufficient to state a plausible claim.  It could be argued that Plaintiff has made her comparator allegations in conclusory form, alleging only that the comparators had "comparable duties" or "comparable authority."  However, the standard of review is context-based, and we think that in a case dealing with a limited number of supervisory employees such allegations are sufficient, especially when combined with allegations that the comparators were all outside her protected class and at least two of them were in the same pay scale.  Plaintiff has pled more than just a threadbare recital of the elements of her claim, *see Golod*, *supra*, 403 F. App'x at 702; she has supported the fourth element with comparator allegations. Additionally, to require more would come too close to obligating a plaintiff to plead

evidence, which a plaintiff does not have to do at the pleading stage.  *In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300, 325 n.25 (3d Cir. 2010).

Defendants also argue that the two-step pay raise Plaintiff received shows that there was no sexual discrimination in her salary.  We reject this position since Plaintiff alleges that even with the pay increase, her salary was less than her male counterparts.

### 2.  *The Discharge Claim*

Defendants assert that Plaintiff fails to state a claim that she was discharged because of her gender.  The allegations pertinent to the discharge claim are as follows. "Except for her final weeks of employment, Plaintiff was the sole female Bureau Director in Water Management of DEP."  (Doc. 18, Am. Compl. ¶ 15). After Plaintiff was fired, she was replaced by "a less qualified male," Jeffrey Means.  (*Id.* ¶¶ 42 and 50).  Means had previously been demoted from the position of bureau director at another deputate which was much smaller in size and responsibility than the Bureau of Waterways Engineering. (*Id.* ¶ 63(a)).  "Means does not have a master's degree or equal education to Plaintiff." (*Id.* ¶ 63(b)).  "Means did not have the proven experience and knowledge in flood protection, stream improvement and dam safety programs."  (*Id.* ¶ 63(c)).  And "Means did not have the background and work experience in [the] Water Management Deputate" when he replaced Plaintiff.  (*Id.* ¶ 63(d)).

Heffner exhibited "sexual favoritism towards male employees . . . ."  (*Id.* ¶ 53, and Am. Compl., Ex. Q).  She "engaged in a pattern and practice of preferential treatment and sexual favoritism towards male employees laced with solicitation and

sexual interest based on their male gender." (*Id.* ¶ 57).  More specifically, Heffner exhibited sexual favoritism toward Jeffrey Means because Means did not have to compete for the position he took from Plaintiff; the position was not posted "and a search was not performed contrary to usual practice and procedure." (*Id.* ¶ 52, and Am. Compl., Ex. P).  Additionally, Heffner had previously twice promoted Means to positions that were not advertised nor subject to typical Commonwealth hiring and promotion practices and procedures. (*Id.* ¶ 58).  In these promotions, Heffner gave him "significantly higher raises and resulting salaries than the compensation guidelines provided [for] in stark contrast to the female plaintiff." (*Id.*).

Heffner's sexual favoritism toward males is also supported by her treatment of another male, Duke Adams. (*Id.* ¶ 59).  Heffner promoted him to her executive assistant and gave him preferential treatment by letting him assume control of the office in Heffner's absence rather than Plaintiff. (*Id.*)  Heffner exhibited sexual favoritism toward another male, Tom Bold. (*Id.* ¶ 60).  Bold was two levels below Plaintiff and her subordinate, but Heffner "invited Tom Bold to significant internal meetings with the Secretary of DEP and executive staff of DEP[,] excluding" Plaintiff. (*Id.*).

Heffner also gave Glenn Rider preferential treatment "as described above." (*Id.* ¶ 61).  This apparently refers to Rider's earning more as a bureau director than Plaintiff even though he had less seniority in that position, (*id.* ¶ 21(c)), Heffner's approval of Rider's request for an extension of time to complete a two-year strategic plan but refusing Plaintiff's same request even though she gave the same reasons Rider did, (*id.*),

and Heffner's choice to name Rider (and other males) as her alternate instead of Plaintiff when Heffner was out of the office.  (*Id.* ¶ 31).

It appears the foregoing allegations would support a claim that Heffner fired Plaintiff because of her gender on the following reasoning.  Plaintiff alleges (more than just conclusionally but with specific examples) that Heffner exhibits favoritism to males.  Additionally, Plaintiff alleges she was replaced by a less qualified male, again with specific reasons why he was less qualified.  Although Heffner was female and in the same class as Plaintiff, members of the same protected class can discriminate against others in that class, *see Vereen v. Woodland Hills School Dist.*, No. 06-CV-462, 2008 WL 794451, at *21 n.9 (W.D. Pa. Mar. 24, 2008)(citing *Oncale v. Sundower Offshore Services, Inc.*, 523 U.S. 75, 78, 118 S.Ct. 998, 1001, 140 L.Ed. 2d 201 (1998)).

In moving to dismiss, Defendants argue Plaintiff's allegations fail to show a gender-based discharge claim.  They point to the allegation that except for the final weeks of her employment, Plaintiff was the sole female bureau director in the Water Management deputate.  As they argue, a fair inference from this language is that another woman was hired at Plaintiff's level at about the same time Plaintiff was terminated, thereby negating her claim she was discharged because of her sex.  They also note that Heffner is herself female and that although it is not dispositive in itself that the decision maker is in the same class as the plaintiff, *see Oncale, supra,* 523 U.S. at 78, 118 S.Ct. at 1001 ("Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against

other members of their group.'")(quoted case omitted), it supports their position that Plaintiff has not made a plausible claim that she was discharged because of her sex.

In opposition, Plaintiff opens with a procedural point.  She argue that Fed. R. Civ. P. 12(g)(2) bars Defendants from relying on the allegation that there was another female bureau director in the few weeks before Plaintiff was fired as that allegation was in the original complaint and Defendant did not cite it in its Rule 12(b)(6) motion to dismiss that pleading.

In pertinent part, Rule 12(g)(2) prohibits a party from "raising a defense or objection that was available to the party but omitted from its earlier motion."  Rule 12(g)(2) does not apply here because Plaintiff's Amended Complaint contains new factual averments that Defendants are entitled to challenge by another Rule 12(b)(6) motion. *Negron v. School Dist. of Philadelphia*, No. 13-CV-169, 2014 WL 144720, at *3 (E.D. Pa. Jan. 15, 2014)("because Negron's amended complaint supplements the factual allegations regarding the CHRIA claim, the School District is not barred from raising new defenses and objections to that claim").  Additionally, Defendants' reliance on the allegation is just a single strand of their argument.

We therefore consider Defendants' argument based on the existence of another female bureau director, hired at almost the same time Heffner, a female, was supposedly terminating Plaintiff on the basis of gender.  Plaintiff contends that we should ignore the new female bureau director because "the recently hired female was not similarly situated nor a like comparator . . . ."  (Doc. 22, Opp'n Br., ECF p. 15).  As

Defendants note, this is contrary to Plaintiff's reliance on male bureau directors as similarly situated comparators.  We can also consider Defendants' other point, that the decision-maker Heffner is in the same class as Plaintiff.  We may not see this as being dispositive, but can consider it among other factors.  *Vereen*, *supra*, 2008 WL 794451, at *21 n.9 (when the decision maker is a member of the same protected class as the plaintiff, it tends to undermine the contention that race or sex was a factor in the hiring decision).

We will nonetheless allow the discharge claim to proceed.  Plaintiff has alleged more than conclusionally that Heffner prefers men and that she was replaced by a less qualified male, with allegations supporting why the male is less qualified. Defendants' points can be renewed at a later stage of the case.[5]

### 3. *The Hostile Work Environment Claim Based on Hines's Conduct Is Time-Barred*

Plaintiff makes a claim for a hostile work environment, *see Mandel*, *supra*, 706 F.3d at 167,  based on the following allegations involving Hines.  In 2009, Hines was promoted to Deputy Secretary of Water Management, (Doc. 18, Am. Compl. ¶ 22), and served in that job through January 2011.  (*Id.* ¶ 23).  During this time, "Hines subjected Plaintiff to sexual harassment including unwelcome touching, leering and sexual advances and innuendos that Plaintiff repeatedly rejected."  (*Id.* ¶ 25).

---

[5]  Since we are allowing the discharge claim to proceed, we will also allow the quid pro quo discharge claim based on Hine's involvement to proceed as well.

Defendants argue that any claim based on this conduct is barred by the statute of limitations for Title VII actions, which requires a claim to be filed with the Equal Opportunity Employment Commission (EEOC) within 300 days of the unlawful employment practice.  *See Mikula v. Allegheny Cnty.*, 583 F.3d 181, 183 (3d Cir. 2009). Plaintiff filed her charge with the EEOC on July 19, 2012, (Doc. 22-1), well beyond the 300-day deadline for events that occurred at the latest by January 2011.  In opposition, Plaintiff argues the claim is timely since Hines's conduct forms the basis of her quid pro quo discharge claim, which *was* timely filed as her discharge occurred on April 6, 2012.

Plaintiff misconstrues Defendant's argument.  They move to dismiss a hostile work environment claim separate from the claim base on her discharge.  As we noted above, Plaintiff can pursue her quid pro quo discharge claim.  The hostile work environment claim based on Hines's conduct is time-barred.  This applies to the PHRA claim as well, *see Mandel*, *supra*, 706 F.3d at 164-65 (180-day limitations period for filing a PHRA claim), and the section 1983 equal-protection claim.  *Giles v. City of Philadelphia*, 542 F. App'x 121, 122 (3d Cir. 2013)(nonprecedential)(in Pennsylvania, the statute of limitations for a section 1983 action is two years).  We will dismiss this claim as time-barred.

4.  *The Hostile Work Environment Claim Based
    on Heffner's Conduct*

Plaintiff has made a hostile work environment claim based on Heffner's alleged conduct.  Defendants argue that the conduct alleged does not rise to the level of a

hostile work environment, citing *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1297 (3d

Cir. 1997)(observing in the context of a quid pro quo claim that "not every insult, slight, or

unpleasantness gives rise to a valid Title VII claim").

      The pertinent allegations are as follows.  "Plaintiff complained on multiple

occasions to Defendant Heffner that Plaintiff was denied equal wages and unequal work

conditions compared to the preferential treatment accorded Glenn Rider, then a similarly

situated male director with comparable job duties, authority and same supervisor."  (Doc.

18, Am. Compl. ¶ 29).

      In response, and unlike the treatment given to Rider, "Defendant Heffner

shunned the female plaintiff and precluded her from business communication, information

and meetings."  (*Id.*, ¶ 30).  More specifically, Heffner "regularly cancelled one-on-one

meetings, failed to respond to Plaintiff's email inquiries for business information,

clarification and instruction, and failed to communicate with Plaintiff by phone or in-person

instead communicating with the Male Bureau Director Glenn Rider and other male staff."

(*Id.*).  Also, "Heffner approved Glenn Rider's request for an extension of time to complete

a two (2) year strategic plan BUT refused to approve Plaintiff's exact request for an

extension for the same reasons provided by Glenn Rider."  (*Id.*)(emphasis in original).

Additionally, Heffner "deliberately overlooked the female plaintiff Bureau Director and

placed the males as her alternate when Defendant Heffner was out of the office.

Defendant Heffner placed Glenn Rider as her alternate and otherwise placed her lesser

male Executive Assistant Duke Adams in charge despite Plaintiff's availability."  (*Id.* ¶ 31, and Am. Compl., Ex. F).

Further, Defendant Heffner "circumvented the 'chain of command' and deliberately communicated with her subordinate staff to keep the plaintiff out of the loop and in the dark on policy changes and implementations."  (*Id.* ¶ 33).  "On occasion she invited male Jeffrey Means, then not associated with Water Management, instead of the plaintiff to internal meetings that he had no business or reason" to attend.  (*Id.*).

Heffner "invited Plaintiff's subordinate male section chiefs to meetings on high level capital budget issues and addressed questions and discussions with them instead of directing the questions and discussion to the Plaintiff" when "[t]he subordinate male section chiefs had NO business necessity to be at the meeting, NO involvement in the budget, NO knowledge of the budgetary process, and NO authority on the subject." (Doc. 18, Am. Compl. ¶ 33(a))(emphasis in original).  "They were unable to answer the questions yet Defendant Heffner refused to acknowledge the Plaintiff's presence, authority and ability to provide the information and necessity to discuss the issues relevant to her management of her Bureau."  (*Id.*).

"Heffner precluded the plaintiff from critical business meetings with Secretary of DEP, executive staff, and Governor's office relative to Plaintiff's programs." (*Id.*, ¶ 33(b)).  "Heffner deliberately precluded Plaintiff from the internal post-recovery task force following the flood of 2011 despite her experience and demonstrated expertise in flood recovery through the flood protection program in her Bureau."  (*Id.*, ¶ 39).

"To succeed on a hostile work environment claim, the plaintiff must establish that 1) the employee suffered intentional discrimination because of his/her sex, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability." *Mandel*, *supra*, 706 F.3d at 167.   "The hostility of a work environment must be determined by the totality of the circumstances." *Fichter v. AMG Resources Corp.*, 528 F. App'x 225, 230 (3d Cir. 2013)(nonprecedential) (quoted case omitted).   "Such circumstances may include 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoted case omitted).  The workplace must have been "permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment . . . ." *Id.* (quoted case omitted)(brackets in original).

We agree with Defendants that Plaintiff's allegations do not meet this standard.  Plaintiff was kept out of the line of communication with Heffner speaking to her subordinates instead, excluded from meetings, not given an extension one time, prevented from working on one flood project, and not placed in charge of the office at certain times.  These actions were not pervasive or severe.  Moreover, they were decisions about how Heffner would manage the office.  "Title VII does not 'guarantee a

Utopian workplace.'"  *Id.* at 231 (quoted case omitted).  We will dismiss the hostile work

environment claim based on Heffner's conduct.

        B.  *Plaintiff's Defamation Claim Survives the*
          *Motion to Dismiss*

      Plaintiff's defamation claim is against defendants Heffner and Logan.

Defendants move to dismiss this claim on the following grounds.  First, the statements are

not capable of a defamatory meaning since they were made only to a select group of

people and thus could not have harmed Plaintiff's reputation in the community.  Second,

the statements were about Plaintiff's actual job performance and such statements made

in the employer-employee context do not support a defamation claim.  Third, Plaintiff still

fails to allege sufficient facts showing that the statements were published to those with no

valid interest in the subject matter or that either Heffner or Logan made the statements to

these people.  Fourth, the statements were privileged as they were made only to those

with a legitimate interest in the subject matter.

      We will take the first, third and fourth arguments together.  We reject them

because the Amended Complaint does adequately allege that Heffner and Logan

published the statements and did so to third parties with no interest in the communication.

Plaintiff alleges "Heffner published falsehoods about Plaintiff's work performance to

tarnish her reputation and discharge her from employment."  (Doc. 18, Am. Compl. ¶ 55,

and Am. Compl., Exs. P, Q).  "Defendant Logan . . . "republished the falsehoods."  (*Id.* ¶

67).  Further, these falsehoods "were published to individuals that had no right to know,"

(*id.* ¶¶ 68 and 110), including "Field Operations Deputate, staff within the Water

Management Deputate, Executive Staff of DEP, Governor's Office, Bureau of State

Employment including but not limited to Melanie DePalma, colleagues through the

Susquehanna River Basin Commission and other commissions, former colleagues

including John Hines and attorneys that Plaintiff had worked with at DEP and outside of

the department on environmental, Water Planning Office and staff at National Resources

and Conservation Service and other federal agencies in contact with DEP."  (*Id.* ¶¶ 68

and 110).  These allegations show that Plaintiff avers both defendants published the

statements and that the statements were published beyond a limited audience and to

persons who had no need for the information.  It also defeats a claim of privilege as

privilege only applies when a publication is "to those with a legitimate interest in the

subject matter."  *See Doe v. Kohn, Nast & Graf, P.C.*, 862 F. Supp. 1310, 1327 (E.D. Pa.

1994).[6]

Defendant's remaining argument is that the statements were about

Plaintiff's actual job performance and such statements made in the employer-employee

context do not support a defamation claim.  In part, Defendants cite in support *Kia v.*

*Imaging Sciences Int'l, Inc.*, 735 F. Supp. 2d 256, 273-74 (E.D. Pa. 2010); *Sheehan v.*

*Anderson*, 2000 WL 288116, *2 (E.D. Pa. Mar. 17, 2000); and *Wendler v. DePaul*, 346

Pa. Super Ct. 479, 483, 499 A.2d 1101, 1103 (1985).  We disagree.  These cases are

---

[6]  Publication beyond a limited audience also relates to the lowering of the plaintiff's reputation in the community.  *See Maier v. Maretti*, 448 Pa. Super. Ct. 276, 282, 284, 671 A.2d 701, 704, 706 (1995).

distinguishable.  The courts did rule that statements about job performance were not defamatory, but it was also important that the statements had only been made to other employees who would have had an interest in the statements.  In the instant case, on the other hand, Plaintiff alleges Defendants published the statements to more than just co-workers or to workplace supervisors.[7]

V.    *Conclusion*

Based on the foregoing, we will dismiss the following claims: (1) the hostile work environment claim based on Hines's conduct; and (2) the hostile work environment claim based on Heffner's conduct.  These claims are dismissed without further leave to amend as amendment would be futile.  The following claims will proceed: (1) the equal pay claim; (2) the discharge claim; (3) a retaliation claim based on Plaintiff's complaints about disparate treatment; (4) the quid pro quo discharge claim; and (5) the state-law defamation claim.

We will issue an appropriate order.

/s/William W. Caldwell
William W. Caldwell
United States District Judge

Date: April 8, 2014

---

[7]   *Wendler* provides some support for Defendants' argument.  There, citing *Beckman v. Dunn*, 276 Pa. Super. Ct. 527, 533, 419 A.2d 583, 586 (1980), the court likened the statements to mere opinion and stated that opinion was not actionable.  However, this was dictum as immediately afterward the court noted that the statement had been made by the defendant as the plaintiff's supervisor and had been given only to a manager.  *Id.*  The court then stated: "Given this factual context and the intended audience, we agree that the alleged statements were not capable of defamatory meaning."  *Id.* (footnote omitted).