IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PATRICIA MCSPARRAN, | : | |
| Plaintiff | : | |
| | : | |
| v. | : | CIVIL NO. 1:13-CV-1932 |
| | : | |
| COMMONWEALTH OF | : | |
| PENNSYLVANIA, PENNSYLVANIA | : | (Judge Caldwell) |
| DEPARTMENT OF | : | |
| ENVIRONMENTAL PROTECTION, | : | |
| KELLY HEFFNER, and JEFFREY | : | |
| LOGAN, | : | |
| Defendants | : | |

*M E M O R A N D U M*

I. *Introduction*

This is an employment-discrimination case. The parties filed cross-motions

for summary judgment. On February 24, 2017, we entered summary judgment in favor of

Defendants and against Plaintiff on the claims that remained for trial. (Docs. 129 and

130). We are considering Plaintiff's motion to alter or amend the judgment under Fed. R.

Civ. P. 59(e).

Plaintiff is Patricia McSparran. Defendants are the Commonwealth of

Pennsylvania (the Commonwealth); the Pennsylvania Department of Environmental

Protection (DEP); Kelly Heffner, at the relevant time, DEP's Deputy Secretary for Water

Management in the Office of Water Management; and Jeffrey Logan, DEP's Executive

Deputy Secretary for Administration and Management. Plaintiff was formerly DEP's

Director of the Bureau of Waterways Engineering and Wetlands, a position where she

was Heffner's immediate subordinate. She brought this suit alleging she was given unequal pay, subjected to harassment, and then fired from her job, all on the basis of her sex.

II. *Procedural History*

In her original complaint, Plaintiff made the following claims: (1) a 42 U.S.C. § 1983 claim based on her federal right to equal protection; (2) a 42 U.S.C. § 1983 claim based on her federal right to due process; (3) a claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*; (4) a claim under the Pennsylvania Human Relations Act (PHRA), 43 Pa. Stat. Ann. §§ 951 *et seq.*; (5) a state-law claim for defamation; and (6) a state-law claim for intentional infliction of emotional distress.

Defendants filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6). We granted the motion. We dismissed the due-process claim and the state-law claim for intentional infliction of emotional distress without leave to amend. We gave Plaintiff an opportunity to amend her complaint to set forth her other claims with greater factual support. *McSparran v. Pennsylvania*, 2013 WL 6631654, at *10 (M.D. Pa. Dec. 17, 2013).

Plaintiff filed an amended complaint. Defendants filed a second motion to dismiss. As we read the complaint, Plaintiff made sexual discrimination claims cognizable under the Equal Protection Clause, Title VII, and PHRA for: (1) failure to give her equal pay; (2) her discharge; (3) a hostile work environment based on conduct of John Hines, who was once a supervisor of Plaintiff; (4) a hostile work environment based

on the conduct of defendant Heffner; and (5) a retaliation claim based on Plaintiff's complaints about disparate treatment. *McSparran v. Pennsylvania*, 2014 WL 1371594, at *7 (M.D. Pa. Apr. 8, 2014). Ruling on Defendants' motion, we dismissed the two hostile work environment claims and decided the following five claims could proceed: (1) the equal pay claim; (2) the discharge claim; (3) a retaliation claim based on Plaintiff's complaints about disparate treatment; (4) a quid pro quo discharge claim based on Hines' conduct; and (5) the state-law defamation claim. *Id.* at *16.

   As noted above, on February 24, 2017, we granted Defendants summary judgment on all of the five remaining claims. On the same day, we ruled on two other motions filed by Plaintiff: (1) Plaintiff's motion (Doc. 104) for an extension of time to complete discovery under Fed. R. Civ. P. 56(d); and (2) Plaintiff's motion (Doc. 105) for reconsideration of the order granting Defendants' motion *in limine* striking certain e-mails from evidence. We denied both motions. *See McSparran v. Pennsylvania*, 2017 WL 736813, at *2 (M.D. Pa. Feb. 24, 2017)(Rule 56(d) motion); *McSparran v. Pennsylvania*, 2017 WL 758283, (M.D. Pa. Feb. 24, 2017)(reconsideration motion on Defendants' motion *in limine*).

   As part of the motion to alter or amend, Plaintiff's counsel filed a declaration (Doc. 145-4) made pursuant to 18 Pa. Cons. Stat. Ann. § 4904. In her declaration, counsel alleged, in part, that she had contacted Chambers concerning the opportunity to file a supplemental response to Defendants' motion for summary judgment and was advised to await the issuance of orders on the Rule 56(d) motion and the motion for

reconsideration before filing the supplemental response. She avers she was reasonably expecting the rulings on the discovery motions before the ruling on summary judgment. She was expecting an opportunity to supplement her filings in opposition to summary judgment, including evidence newly presented on her motion to alter or amend, which Plaintiff designated Exhibit C to her motion, the Declaration of Patricia McSparran (Doc. 139-5); the exhibits referred to in that declaration, Exhibits E through J (Doc. 139-7 through 12); and Exhibit K (Doc. 141), filed under seal.

Upon consideration of this declaration, the court concluded that it was remiss in not granting Plaintiff an opportunity to file a supplemental response before ruling on Defendants' summary judgment motion. Based on our conclusion, although a motion to alter or amend usually cannot be used to argue evidence previously available, *see Worbetz v. Ward North America, Inc.*, 54 F. App'x 526, 533 (3d Cir. 2002) (nonprecedential), we decided to consider the new evidence Plaintiff presented on her motion to alter or amend. As noted, the new evidence was Exhibit C to her motion, the Declaration of Patricia McSparran (Doc. 139-5); the exhibits referred to in that declaration, Exhibits E through J (Doc. 139-7 through 12); and Exhibit K (Doc. 141).

The McSparran declaration (Doc. 139-5) was a seventeen-page, single-spaced narrative which included evidence not directly bearing on Plaintiff's discrimination claim. We issued an order (Doc. 147) requiring Plaintiff's counsel to edit the declaration to focus solely on the facts supporting Plaintiff's discrimination claim under the burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817,

36 L.Ed.2d 668 (1973). The declaration was to be in numbered paragraphs, and Plaintiff was to show how each fact was relevant to any of the ways at step 3 she may meet her burden of showing pretext under *McDonnell Douglas*. (*Id.*) After the edited declaration was filed, Defendants were given an opportunity to address the relevance of the new evidence, including the edited declaration. (*Id.*) Plaintiff was granted an opportunity to file a reply brief. (*Id.*)

After two extensions of time, Plaintiff filed an edited declaration. (Doc. 152-1). The edited declaration did provide some numbering and two headings that bore on pretext, but expanded the declaration from seventeen to twenty-seven pages, and was silent on many of the 147 paragraphs as to how they were relevant to pretext. The parties have completed their briefing on the new evidence.

There are three sets of briefs: (1) a set relating to Plaintiff's motion to alter or amend; (2) a set relating to Plaintiff's edited declaration; and (3) a set relating to the exhibits referred to in Plaintiff's original declaration.

III. *Standard of Review*

Typically, the scope of a motion to alter or amend "is extremely limited." *Blystone v. Horn*, 664 F.3d 397, 415 (3d Cir. 2011). A motion for reconsideration under Rule 59(e) is used "'to correct manifest errors of law or fact or to present newly discovered evidence.'" *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010)(quoting *Max's Seafood Café ex rel. Lou–Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999)). "A proper Rule 59(e) motion therefore must rely on one of three grounds: (1) an

intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Id.* It cannot be used to reargue issues that the court has already considered and disposed of. *Blanchard v. Gallick*, No. 09–1875, 2011 WL 1878226, at *1 (M.D. Pa. May 17, 2011)(Caldwell, J.).

Plaintiff acknowledges this standard and attempts to meet it by arguing that in ruling on the summary judgment motions the court committed clear error of law in applying the summary judgment standard. (Doc. 146, Pl.'s Rule 59(e) Reply Br. at ECF p. 1). As noted above, however, the court will also consider Plaintiff's new evidence, although such previously available evidence is normally not considered when deciding a Rule 59(e) motion. *Worbetz,* 54 F. App'x at 533.

The standard of review for a Rule 59(e) motion "relates back to the standard applicable in the underlying decision." *Johnson v. Fed. Express Corp.*, 996 F. Supp. 2d 302, 324 (M.D. Pa. 2014). Thus, "[w]hen a motion for reconsideration challenges the court's decision to grant or deny summary judgment, Federal Rule of Civil Procedure 56 controls the analysis." *Id.*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We "must view all evidence and draw all inferences in the light most favorable to the non-moving party" and we will only grant the motion "if no reasonable juror could find for the non-movant." *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008).

IV.  *Discussion*

We will not provide a separate background section as we will assume familiarity with the background provided in the memorandum (Doc. 129) dealing with the parties' cross-motions for summary judgment.  We will supplement the record as appropriate.

A.  *The "Porngate Report" does not support Plaintiff's claims*

Plaintiff was terminated without notice or opportunity to respond.  She argues that, after the parties filed their motions for summary judgment, the Commonwealth released a report on November 22, 2016, sometimes referred to as the "Porngate Report" (Doc. 139-3, Ex. A to Plaintiff's motion), that supports several of her claims, including her now-dismissed due process claim.

The Report deals with the widespread use of the Commonwealth's e-mail system to send and receive inappropriate e-mails, including pornography and gender-based derogatory jokes.  According to Plaintiff, the Commonwealth delayed releasing the Report so that those named in the Report could defend themselves.  (Doc. 139-6, newspaper article).  Plaintiff argues the Report is relevant here because:

> The findings of the Porngate Report contradict and rebut Defendants' purported business reasons for discharging Plaintiff, support Plaintiff's arguments of pretext and preferential treatment towards males, and establish Plaintiff's viable claims under Section 1983 that her liberty interests and due process rights were violated.  Plaintiff was not provided notice or equal opportunity to contest and rebut the alleged

accusations that resulted in her discharge, tarnished her
reputation, and foreclosed employment opportunities.

(Doc. 139, Pl.'s motion to alter or amend at ECF p. 2).

We disagree that the Porngate Report assists Plaintiff. For at least one reason the report has no relevance to the discovery sought – Plaintiff was not disciplined in Porngate (and we hasten to add she had no connection whatsoever to that scandal). There is therefore no comparator evidence that would make the Porngate Report relevant.[1] It is for this reason that Plaintiff's reliance on Tom Bold, a male DEP employee caught in the Porngate scandal, is also irrelevant.

B. *The defamation claim*

Plaintiff argues we erred in entering judgment against her on the defamation claim. She points out that we allowed this claim to survive the motion to dismiss the amended complaint. *See McSparran v. Pennsylvania*, 2014 WL 1371594, at *15 (M.D. Pa. Apr. 8, 2014). We agree that we allowed this claim to survive the motion to dismiss. However, we decided otherwise at the summary judgment stage. Plaintiff's defamation claim was based on Heffner's statements in her February 12, 2012 e-mail. (Doc. 129, summary judgment memorandum at ECF p. 57). We decided on summary judgment that Plaintiff had no defamation claim because "the statements were not

---

[1] A comparator is an employee who is "similarly situated" to the plaintiff. "A determination of whether employees are similarly situated takes into account factors such as the employees' job responsibilities, the supervisors and decision-makers, *and the nature of the misconduct engaged in*." *Wilcher v. Postmaster General*, 441 F. App'x 879, 882 (3d Cir. 2011)(nonprecedential)(emphasis added).

defamatory as they were only criticisms of Plaintiff's job performance. This reason alone defeats the claim." (Doc. 129, at ECF p. 60)(citing *Wendler v. DePaul*, 499 A.2d 1101, 1103 (Pa. Super. Ct. 1985)(comments that adversely reflect on a plaintiff's fitness for her profession are defamatory, but criticism of her job performance is not). Any other arguments Plaintiff has about the resolution of the defamation claim do not bear on this ruling. We will therefore not resurrect the defamation claim.

C. *The quid pro quo claim*

Plaintiff claims she was discharged because she refused John Hines' sexual advances. Hines was once the Deputy Secretary for Water Management and Plaintiff's supervisor. In support, she points to the evidence that Hines told Jeffrey Means, Plaintiff's replacement, he would be a bureau director again, more than likely going "wherever the 102/105 Program ended up." That "program" was where Means spent most of his career. (Doc. 107-17, ECF pp. 8-9, Means Dep.). The Chapter 102/105 programs were moved into the Bureau of Waterways Engineering and Wetlands, Plaintiff's bureau before she was discharged.

We fail to see how this evidence supports Plaintiff's quid pro quo claim. We entered judgment in favor of Defendants on this claim because the evidence showed that Heffner had made the decision to discharge Plaintiff, not Hines.

D. *Alleged violation of the Commonwealth's hiring and anti-discrimination policies*

Plaintiff claims she was harmed by Defendants' alleged violation of the Commonwealth's hiring and anti-discrimination policies. (Doc. 146, Pl.'s Reply Br. at ECF p. 7). This argument seems to relate to her pretext claim that males were treated more favorably. The Commonwealth's Management Directive 515.16 provides that "to ensure equitable treatment of minorities and females during the selection process," in pertinent part, "information must be provided on all candidates who applied or were referred . . . ." (Doc. 146-4, ECF p. 2). The Commonwealth's Management Directive 515.10 provides that "Non-Civil Service vacancies will be filled by the best available candidates based on objective, work-related job criteria." The policy further states that "No agency shall interview an applicant before receiving approval from BSE." (Doc. 146-5, at ECF p. 2). BSE is the Bureau of State Employment, the bureau within the Office of Administration that gathers resumes of candidates that BSE would forward to agencies that have vacancies. (Doc. 91, (DSMF ¶ 16)). According to Melanie DePalma, BSE's Director, the Commonwealth "prohibits a sexual relationship between a supervisor and their subordinate in that (sic) subordinate receiving favorable treatment." (Doc. 146-7, at ECF pp. 3-4, DePalma Dep.).

We reject Plaintiff's reliance on these directives and DePalma's testimony. Plaintiff presents us with no authority showing that the directives provide her with a cause of action, and her discharge claim was properly analyzed under *McDonnell Douglas, infra*, which applies not only to a Title VII claim but to a parallel state-law claim as well. We add

-10-

that Plaintiff is not making a claim that DEP refused to hire her, which the cited portions of the directives would seem to apply to.

E.  *The discharge claims and evidence of pretext from Plaintiff's edited declaration and additional exhibits*

Plaintiff claimed her discharge was gender-based and sought relief under the Equal Protection Clause of the Fourteenth Amendment, Title VII, and PHRA. These claims were all analyzed under the three-step, burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for pretext cases.

As noted, Plaintiff's counsel asserted in a declaration accompanying Plaintiff's motion to alter or amend that she was expecting to be able to file a supplemental response to Defendants' motion for summary judgment. That supplemental response would include the following new evidence that was filed with the reconsideration motion (although the evidence was available to Plaintiff previously): Exhibit C, the Declaration of Patricia McSparran (Doc. 139-5); the exhibits referred to in that declaration, Exhibits E through J (Doc. 139-7 through 12); and Exhibit K (Doc. 141).

Upon consideration of the declaration, we decided we were remiss in not allowing a supplemental response. Based on that conclusion, we said we would consider the new evidence but that Plaintiff would have to submit an edited McSparran declaration. The declaration was to focus solely on the facts supporting Plaintiff's discrimination claim under the burden-shifting framework in *McDonnell Douglas*, it was to be in numbered

-11-

paragraphs, and Plaintiff was to show how each fact was relevant to any of the ways at step 3 she may meet her burden of showing pretext under *McDonnell Douglas*.

Briefly, the *McDonnell Douglas* analysis proceeds in three steps. In the first step, the plaintiff has the burden of establishing a prima facie case of discrimination. *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013). In the second step, "the burden of production then shifts to the defendant to offer a legitimate non-discriminatory justification for the adverse employment action." *Id.* (citation and internal quotation marks omitted)(brackets omitted). In the third step, the burden of production shifts back to the plaintiff "to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination." *Id.* "A plaintiff may demonstrate pretext at summary judgment in two different ways. In the first way, the plaintiff may point to evidence in the record that would cause a reasonable juror to disbelieve the employer's articulated legitimate non-discriminatory reason . . . ." *Id.* at 430. In the second way, "the plaintiff may also defeat summary judgment by pointing to evidence that indicates that the employer acted with discriminatory animus." *Id.* at 430-31.

Plaintiff can satisfy the first method of demonstrating pretext by providing evidence that "demonstrate[s] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Id.* at 427 (citation and internal quotation marks omitted). However, Plaintiff "cannot simply

show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994).

Plaintiff can satisfy the second method of demonstrating pretext by pointing to evidence that would lead a reasonable juror to believe "that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Shaner v. Synthes (USA)*, 204 F.3d 494, 501 (3d Cir. 2000)(internal quotation marks and quoted cases omitted). Specifically, a plaintiff could satisfy the second way "by showing that the employer in the past had subjected [her] to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not of [her] protected class more favorably, or that the employer has discriminated against other members of [her] protected class or other protected categories of persons." *Fuentes*, *supra*, 32 F.3d at 765.

In their brief in opposition to the edited declaration, Defendants argue the following. First, the declaration should not be considered as Plaintiff failed to follow the court's order. As noted, the edited declaration (Doc. 152-1) did provide some paragraph numbering and two headings that bore on pretext, but expanded the declaration from seventeen to twenty-seven pages. Defendants maintain that, given the benefit of the court's discretion in allowing her to submit additional information, instead of focusing solely on the facts supporting pretext, Plaintiff filed an expanded declaration "<u>not</u> focused

on anything." (Doc. 155, Defs.' Br. in Opp'n at ECF p. 8)(emphasis in original). Defendants contend that since the edited declaration is not in the form ordered, we should conclude that it fails to show pretext. Defendants warn that if we accept anything in the edited declaration, we will allow Plaintiff to control the proceedings in an apparent hope on her part to place something in the record that would support her claim.

Second, since Defendants' ability to comment on the relevance of the edited declaration was dependent on Plaintiff's complying with the court's order, and since Plaintiff did not do so, Defendants' position is that the declaration contains nothing of relevance on the issue of pretext.

Third, even if the allegations are considered, they do not show pretext. Overall, the allegations indicate Plaintiff wants the court "to act as a super-HR department – comparing qualifications; considering staffing decisions; evaluating the practice of employee movement throughout the agency; deciding whether arguments over budget priorities were justified; deciding whether going over her supervisor's head was appropriate; and the like." (Doc. 155, Defs.' Br. in Opp'n at ECF p. 12). Defendants assert such allegations are not evidence of pretext because evidence that the employer is wrong or mistaken in the employment decision does not show pretext. *Fuentes,* 32 F.3d at 765.

Defendants next assert the first 39 paragraphs list her background and experience and have nothing to do with pretext. Defendants then note that in paragraphs 40-45, Plaintiff compares her qualifications to those of Means and asserts he was not as

qualified as she.  Defendants contend that to demonstrate pretext, Plaintiff would have to show that Means' qualifications were "so much lower" than Plaintiff's that the fact finder "could disbelieve the claim that the employer was honestly seeking the best qualified candidate."  *Steele v. Pelmor Laboratories Inc.*, 642 F. App'x 129, 135 (3d Cir. 2016)(nonprecedential).

Defendants next argue that the court recognized that Plaintiff's termination was because of her personal attitude and not her qualifications, (Doc. 155, Defs.' Br. in Opp'n at ECF p. 14), and that attitude at work is a valid reason for discharge that does not implicate employment discrimination, citing *Willis v. UPMC Children's Hosp.*, 808 F.3d 638, 648 (3d Cir. 2015).  Further, not posting the job or interviewing candidates is also insufficient to show pretext.  *See Jones v. Temple Univ.*, 622 F. App'x 131, 135 (3d Cir. 2015)(nonprecedential)(not posting a job in violation of policy was not enough, among other things, to show that the reason for failure to hire was pretextual).  Thus it is immaterial that the job was not posted or that Means was not interviewed for Plaintiff's position.

Defendants contend we should also reconsider our decision to exclude other evidence from the record on the basis of hearsay and to now consider that evidence on Plaintiff's motion to alter or amend.[2]  By way of background, Defendants' statement of material fact at ¶¶ 60, 95, and 97 relied on the Commonwealth and DEP's answers to

_____

[2]  Defendants filed a motion for reconsideration of the excluded evidence.  (Doc. 154). The motion will be dismissed as moot since Defendants can simply argue the legal point in their brief on the edited declaration.  (*See* Doc. 155 at ECF pp. 18-20).

Plaintiff's first set of interrogatories (Doc. 91-7). In those answers, Defendants set forth

factual statements by certain identified co-workers that Defendants assert are consistent

with Heffner's views of Plaintiff's conduct at work. Plaintiff objected to these statements

because they were not verified by the individuals, nor made under oath or penalty of

perjury by the individuals. We decided the statements were inadmissible hearsay, even

though the answers were signed by an officer or agent of the Commonwealth and DEP,

as permitted under Fed. R. Civ. P. 33(b)(1)(B). (Doc. 129, n.12, n.16, and n.19). Citing

*Katiroll Co., Inc. v. Kati Roll & Platters Inc.*, No. 10-CV-3620, 2014 WL 12634921, at *6

(D.N.J. Apr. 8, 2014), Defendants maintain we were mistaken, that under Rule

33(b)(1)(B) the statements were admissible on summary judgment because the officer or

agent need not have personal knowledge to sign the interrogatory answers.

We believe our ruling was correct. *Katiroll* is distinguishable. In that case,

the plaintiff challenged the validity of answers to interrogatories on the grounds that: (1)

no officer or agent of the answering corporation furnished the information set forth in the

answers; and (2) the answers did not show the name of any witness who could testify at

trial about the information set forth in the answers. 2014 WL 12634921, at *6. Rejecting

the argument, the court stated that Rule 33(b)(1)(B) did not require the agent signing the

answers to have personal knowledge of the information set forth in them.

The instant case is different because we do not deal with the requirements

of Rule 33(b)(1)(B), but whether answers to interrogatories are admissible in evidence.

We decided that these particular interrogatory answers were not admissible because they

constituted hearsay, citing *Heritage Bldg. Group, Inc. v Plumstead Twp.*, 1996 WL

460049, at *13 (E.D. Pa. 1996); and *Betco Corp. v. Peacock*, No. 14-CV-193, 2015 WL

856603, at *2 (W.D. Wis. Feb. 27, 2015)(interrogatory answers signed on behalf of

plaintiff company by two of its officers would be considered but only to the extent the

answers contain information the officers could testify to at trial).[3]

As to Defendants' objections that Plaintiff failed to comply with the court

order, Plaintiff counters that the length and detail in the edited declaration were necessary

to oppose what she considered the six vague reasons, described below, that Heffner

gave for her discharge.  (Doc. 158, Pl.'s Br. in Opp'n at ECF p. 8).  Further, the edited

declaration contained "voluminous detailed facts" concerning less favorable treatment

than similarly situated male bureau directors.  (Doc. 158, Pl.'s Br. in Opp'n at ECF p. 8).

In her opposition brief, Plaintiff goes on to explain the relevance of each allegation.

It is true that Plaintiff has not complied with the court order, but in light of

her explanations, and the ability to follow Plaintiff's argument as to relevance, we will not

strike the edited declaration but examine it to see if it asserts sufficient pretext.

---

[3]    Interrogatory answers may be submitted as part of the record on summary judgment, Fed. R. Civ. P. 56(c)(1)(A), and answers to interrogatories can be signed by an officer or agent of a party. Fed. R. Civ. P. 33(b)(1)(B).  That is what occurred here: a DEP agency lawyer signing the answers on behalf of the Commonwealth and DEP.  But a party may object that "material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence," Rule 56(c)(2), and answers to interrogatories "may [only] be used to the extent allowed by the Federal Rules of Evidence."  Fed. R. Civ. P. 33(c).

1. *Showing pretext by pointing to evidence in the record that would cause a reasonable juror to disbelieve the employer's articulated legitimate non-discriminatory reasons for the discharge*

Plaintiff asserts some of the allegations show that a reasonable juror could disbelieve the reasons given for her discharge, one way of showing pretext.  As we noted in our summary judgment memorandum, Defendants supplied the following reasons for the termination.

First, in an e-mail dated February 16, 2012, Heffner provided the following rationale:

> The incumbent in the position of Director of Waterways Engineering and Wetlands has failed to demonstrate interest in supporting the goals of the Administration or working successfully within the fiscal parameters that have been provided.  The incumbent goes beyond accepted advocacy for program and staff.
>
> The incumbent in this position has failed to demonstrate leadership qualities that support the Agency and the Administration and further has not demonstrated the ability to act as a team player.  There is no support of fellow Bureau Directors, to the point of disparaging language about one specific fellow Director.
>
> The overall attitude is one of superiority and disdain for those in the Chain of Command.

(Doc. 85-5, ECF p. 3).

Second, in an affidavit presented in Plaintiff's EEOC proceedings, Heffner gave the following explanation of her decision:

> As the immediate supervisor of Patricia McSparran, I determined that the negative attitude and conduct which she

demonstrated in carrying out her official responsibilities over the months preceding my decision in November 2011 made her a poor choice to head an important Administration initiative. Ms. McSparran's conversations were rarely without rancor, sarcasm, complaint, or venom. For instance, during a bureau director meeting I convened, Ms. McSparran stated that she had no idea why Interstate Waterways was converted to a bureau. She called into question the director's ability to do the job. She did not support the efforts of the Administration. For instance, in the Rendell Administration, there was $1.2 million for Flood Protection. It was originally placed in the budget to support the economy - to make flood repairs, to put people to work right away. In previous budgets, when the agency received funding, the bureau paid for its complement of personnel from that fund. Governor Corbett's administration decided to remove the line item. DEP did not furlough the employees for whom funding was no longer available. We moved the affected employees to other positions in the agency.

Ms. McSparran, however, was particularly offended by the decision. She indicated that we moved good, smart people and stated that they would leave the agency because of the moves. I followed-up on her concerns . . . [and] learned that what we did to reassign people was correct and appropriate. I shared that information with Ms. McSparran. However, she would repeatedly come to my office and say that the persons we transferred were unhappy; we were adversely impacting careers. . . . I met with an employee who was an Engineer in Training (EIT) and his supervisor. The employee did not covey any concerns about the move. . . .

On another occasion that I recall, Ms. McSparran bypassed the chain of command and went directly to Executive Deputy Secretary Logan to ask how the agency could retrieve the line item money. She continued to disagree with my direction and the Administration's goals.

When I would give an assignment to directors, I would provide due dates. Everyone was clear that when I said "by close of business" that meant by 4 p.m. because of my support staff's work schedules. Ms. McSparran would

typically submit the information after 4 p.m.  We were working together on a two-year plan.  Ms. McSparran's entire submission was a series of complaints that the Bureau wanted to do certain things, but didn't have the money or complement. I would ask, based on the resources that she had, what statutorily mandated work could and would be performed.  After those conversations, Ms. McSparran's attitude was modified a bit.  But, the change was not long-term or consistent.

(Doc. 82-28, ECF pp. 2-3, Heffner EEOC Aff. of Nov. 28, 2012).

Several reasons for discharge are presented in these statements.  It is not just one reason, her attitude, as Defendants currently assert.  (Doc. 155, Defs.' Br. in Opp'n at ECF p. 16).  Other reasons from the February 16, 2012 e-mail are:  (1) Plaintiff failed to demonstrate interest in supporting the goals of the Administration or working successfully within the fiscal parameters that were provided; (2) Plaintiff went beyond accepted advocacy for program and staff; (3) Plaintiff failed to demonstrate leadership qualities that supported the Agency and the Administration; (4) Plaintiff did not demonstrate the ability to act as a team player; (5) Plaintiff provided no support for fellow Bureau Directors, to the point of using disparaging language about a fellow Director; and (6) her overall attitude was one of superiority and disdain for those in the chain of command.

Plaintiff's edited declaration contradicts some of these reasons. Paragraphs 18 through 32 certainly show that Plaintiff was competent at her job and in that sense could be said to support the goals of the Administration, work successfully within fiscal parameters, stay within accepted advocacy for program and staff, show

-20-

leadership qualities that support the Agency and the Administration and act as a team player.

Plaintiff has added to these allegations the testimony of Dana Aunkst, a fellow bureau director. He testified that he and Plaintiff were colleagues who worked well together. (Doc. 107-18, Aunkst Dep. Ex. QQQ, at ECF p. 3). Aunkst said that in all the times he worked with her, she was a team player and a strong advocate for her employees. (Doc. 82-13, Aunkst Dep. at ECF p. 11). Plaintiff also avers she got along with fellow bureau director Glenn Rider. (Doc. 152-1, McSparran Declaration ¶ 71).

Plaintiff also directly contradicts Heffner's statement that Plaintiff would typically submit information late, more specifically, after the 4:00 p.m. deadline Heffner imposed. Plaintiff affirms that she "met all deadlines from Kelly Heffner on the due dates and by specific times when it was communicated to me." (Doc. 152-1, McSparran Declaration ¶ 83). *See Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005)(plaintiffs must "present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision").

We believe these allegations demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.

> A plaintiff is not required to "cast doubt on each proffered reason in a vacuum. If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may

not need to discredit the remainder. That is because the factfinder's rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available."

*Steward v. Sears, Roebuck & Co.*, 231 F. App'x 201, 211 (3d Cir. 2007)

(nonprecedential)(quoting *Fuentes*, 32 F.3d at 764 n.7).

> 2. *Showing pretext by pointing to evidence in the record that the employer treated other, similarly situated persons not of Plaintiff's protected class more favorably*

McSparran's edited Declaration (Doc. 152-1) and accompanying exhibits contain the following allegations that she claims show favoritism to males:[4]

> "Unlike the male directors and staff that [Heffner] communicated with often and frequently invited to meetings, she rarely communicated with me" and [s]he regularly met with [Plaintiff's] male replacement Jeffrey Means." ¶ 83. According to Means, Heffner came down to his office to meet about the programs. Heffner came straight to Means if she needed to have an answer about programs in his department. (Doc. 139-9, Ex. G, Means Dep. at ECF pp. 3-4.

> When Heffner had been Plaintiff's supervisor for eight months, she "rarely communicated with" Plaintiff "unlike the men with whom she met frequently on their programs." ¶ 85.

> "Kelly Heffner perpetuated a pattern and practice of treating the male bureau directors and male staff members more favorably and she excluded me from crucial business information and meetings that had a negative impact on management of my bureau's programs." ¶ 98.

---

[4] The paragraphs cited are from Doc. 152-1.

"Kelly Heffner did not bring me to meetings with the Secretary of DEP, Executive Staff, the Governor's Office, and other agencies on my programs." ¶ 99.

"Kelly Heffner directly invited my male sections chiefs to a meeting on high level capital budget issues relative to my bureau. She ignored me and directed her attention solely to my subordinate male section chiefs. Despite that I continually answered all of her questions, she addressed questions and discussion with the male staff instead of me. ¶ 101.

"Kelly Heffner regularly visited the male staffers' offices in my bureau to catch up or discuss issues in the bureau but she would not visit me the bureau director even when I directed issues to her attention by email. I saw her in the male staff offices including the offices of Tom Bold and Roger Adams." ¶ 105.

"Kelly Heffner demonstrated her preference for the male bureau directors as soon as she became Acting Deputy Secretary in March 2011 until the last day I worked, April 5, 2012. She placed Glenn Rider in charge in her absence overlooking me who was more senior. She also placed her lesser male Executive Assistant, Duke Adams in charge over me. For example, right after become Acting Deputy Secretary, she was on sick leave from March 31, 2011 through April 16, 2011 and put Glenn Rider in charge the entire time. Beginning October 24, 2011 for a week and a half she placed Duke Adams in charge in her absence. The week of September 12, 2011 she placed Glenn Rider in charge despite the fact that the biggest issue at the time was flood recovery efforts, something for which I was very much involved." ¶ 106.

"Supervisor Kelly Heffner precluded me from attending meetings with Executive Staff or outside agencies but did not exclude the male bureau directors." ¶ 109.

"As my supervisor [Heffner] did not come down to talk to me, she did not call me, she cancelled one-on-one and bureau director meetings, and did not include me in any meetings my programs with her and Executive Staff. I was aware she

held meetings with the male bureau directors Glenn Rider and Andrew Zemba. ¶ 110.

Defendants provided Plaintiff with certain of Heffner's Outlook calendars showing scheduled meetings. (Doc. 152-1, McSparran Decl. ¶ 110). Plaintiff avers that her name does not appear on any of the calendar entries produced, (*id.*), including those she has submitted in evidence. (Doc. 152-1, McSparran Decl. ¶ 110). Plaintiff's Exhibit SSS (Doc. 108-11) and Exhibit K (Doc. 141) are selected calendar entries. They show for thirty-two days the meetings Heffner had, where they took place, and persons in attendance. Contrary to Plaintiff's absence from all calendar entries, it appears that for the entries submitted into evidence, Glenn Rider and Andrew Zemba, fellow bureau directors, had meetings with Heffner; eleven for Zemba, six for Rider, and three meetings with both in attendance. Further, Plaintiff was not invited to at least two meetings she would have been expected to attend because she had worked on the items that were the subject of the meetings. (Doc. 152-1, McSparran Decl. ¶ 107 and Doc. 141, at ECF p. 19; Doc. 152-1, McSparran Decl. ¶ 108 and Doc. 108-11, at ECF p. 9).

Further, as noted in paragraph 109 of her Declaration, quoted above, Heffner excluded Plaintiff from attending meetings with Executive Staff or outside agencies but did not exclude the male bureau directors. Rider and Zemba were included in such meetings, according to the Outlook calendars. (Docs. 141-2, 141-4, 141-7, 141-13, 141-17, and 141-23).

Defendants say the Outlook calendars present no relevant evidence for the following reasons:

First, whatever these printouts show, there is no evidence that these meetings even occurred, as opposed to being cancelled, postponed, or the invitation revised. Second, even these printouts show that women were frequent invitees. Third, the purpose of many, if not all, of the alleged meetings, is unclear. Plaintiff's invitation status is irrelevant for meetings that have nothing to do with her area of expertise. Fourth, even for alleged meetings for which the purpose can be remotely inferred, such meetings have nothing to do with McSparran's area of expertise. Fifth, the Court has no idea which printouts McSparran omitted, so there is no context whatsoever for this information.

(Doc. 161, Defs.' Br. re Exhibits at ECF p. 8).

We disagree with Defendants' assessment of the Outlook calendars. The calendars were used to set up meetings. Plaintiff avers in her declaration that she was not listed on any of them, even those she did not submit into evidence. Further, she points to entries where it would seem that she should have been invited. We think the Outlook calendars are sufficiently probative to assist Plaintiff in opposing summary judgment.

Defendants contend that since the court has recognized that Plaintiff's discharge focused on her attitude rather than her qualifications, if we consider pretext evidence from Plaintiff, we should also consider other evidence Defendants have already placed in the record at Doc. 94 and at Defendants' statement of material fact ¶¶ 66 to 76. (Doc. 91). Specifically, we should consider e-mails Plaintiff sent by way of her DEP e-mail account that purportedly show her "regularly demean[ing] the intelligence and competence of her colleagues." (Doc. 155, Defs.' Br. in Opp'n at ECF p. 17). Defendants assert this evidence supports Heffner's conclusion that Plaintiff had to be discharged

because of her attitude toward co-workers.  Defendants contend that this evidence shows

that there is no genuine dispute of fact concerning the validity of Plaintiff's discharge,

even if Plaintiff's new evidence of pretext is considered.

We disagree that this evidence entitles Defendants to summary judgment.

Heffner did not rely on just one reason for Plaintiff's discharge.  We believe the evidence

Plaintiff has submitted on pretext allows her case to go forward on the claims based on

her discharge, even if the cited e-mails are considered.

In our memorandum granting summary judgment on the gender-based

discharge claims, we dismissed Plaintiff's evidence that she was subjected to

discriminatory treatment.  Plaintiff appeared to present the following evidence at that time.

First, Heffner excluded Plaintiff from business meetings attended by

the male bureau directors.  (Doc. 129, summary judgment memorandum at ECF p. 45).

We dismissed this evidence because it was based on only eight entries from Heffner's

Outlook calendars, which while they showed no mention of Plaintiff, did not include

Zemba either and Rider only once.  We therefore did not consider them sufficiently

probative.  (Doc. 129, at ECF p. 46).  As noted, however, Plaintiff has supplemented

those calendar entries.

Second, Plaintiff asserted Heffner excluded Plaintiff from business

communications, relying on the following evidence:

Heffner did not stop by Plaintiff's office to discuss issues that
Plaintiff had raised by e-mail, but would meet with male
staffers to discuss the issues; "rarely responded to e-mails
from" Plaintiff; "often cancelled monthly one-on-one meeting

with Plaintiff," and did not include Plaintiff in meetings with
Executive Staff or the Governor's Office on her programs.

(Doc. 129, at ECF pp. 46-47)(footnote omitted). We dismissed this evidence by stating:

> We do not find this evidence sufficient at the summary
> judgment stage to establish discriminatory treatment. The
> evidence shows that Heffner had meetings with male
> subordinates, but Plaintiff admits she had meetings with
> Heffner as well. Plaintiff admits she met with Heffner on
> January 10, 2012. (Doc. 82-21, ECF p. 5, Pl.'s answers
> to Defs.' first set of interrogatories). She also met with
> Heffner on January 31, 2012. (Doc. 107-27). Plaintiff also
> says Heffner failed to meet with her on issues raised in emails
> but admits Heffner did respond to her e-mails, albeit rarely.
> Plaintiff also says Heffner "often cancelled one-on-one
> meetings," but this means that she did attend those meetings
> on occasion. As for failing to include Plaintiff in meetings with
> Executive Staff or the Governor's Office on her programs, this
> is not sufficient evidence by itself to allow a factfinder to
> decide that Plaintiff's discharge was gender-based.

(Doc. 129, at ECF . 47). Upon further reflection, we think this analysis should have been

left to the jury to determine if the minimal contact Plaintiff had with Heffner was due to

Plaintiff's gender.

We add that we dismissed Heffner's failure to include Plaintiff in meetings

with Executive Staff or the Governor's Office on her programs on the basis that, by itself,

it was insufficient evidence. We did the same with the evidence that Heffner consistently

placed Rider and Adams in charge of the office rather than Plaintiff. However, evidence

cannot be considered in isolation. *See Bray v. Marriott Hotels*, 110 F.3d 986, 991 (3d Cir.

1997)("we must determine whether *the totality of the evidence* would allow a reasonable

factfinder to conclude" that bias has been established)(emphasis in original). We find,

therefore, that we committed a clear error of summary-judgment law in our prior analysis involving evidence on the discharge claims.[5]

### F.  *The Retaliation Claim*

We granted summary judgment on the retaliation claim based on our conclusion that there had been no adverse action, which in turn was based on our ruling that there was no disparate treatment, as described above.  (Doc. 129, at ECF pp. 51-52).    Since we now find sufficient evidence of disparate treatment, the retaliation claim survives summary judgment.

### G.  *The Equal Pay Claim*

Plaintiff indirectly challenges the entry of summary judgment on her equal pay claim.  (*See* Doc. 146, Pl.'s Rule 59(e) Reply Br. at ECF pp. 12-13).  We have reviewed the argument and conclude that summary judgment was proper on the equal pay claim for the reasons given in our summary judgment memorandum.  (*See* Doc. 129, at ECF pp. 52-55).

---

[5]  We observe that Plaintiff argues that disparate treatment is shown by Jeffrey Means and Duke Adams being given promotions without having to go through a competitive process. We adhere to our prior reasons why this was not disparate treatment.  (*See* Doc. 129, at ECF pp. 43-44).

V.  *Unresolved issues from Defendants' summary judgment motion*

In our February 24, 2017, order we disposed of Plaintiff's remaining claims without having to resolve two other issues Defendants raised.  Since we are now allowing certain claims to proceed, we will address those unresolved issues.

First, Defendants argue Plaintiff's damages should be limited because she committed a dischargeable offense by retaining DEP documents on her home computer after she was terminated, a violation of Commonwealth policy.  However, Defendants admit that they lack enough information to determine if Plaintiff's alleged misconduct was sufficient to lead to her dismissal.  They nonetheless request a ruling under Fed. R. Civ. P. 56(g) to establish certain facts that would support a ruling in future proceedings in this case that she would have been discharged.  We decline to do so, although Defendants can pursue this issue at trial.

Second, Defendants argue that Plaintiff's damages should be limited under the doctrine of judicial estoppel based upon alleged inconsistent statements she made in this case and in worker's compensation proceedings she has also pursued.  We decline to do so for two reasons.  To begin with, Defendants do not tell us the specific form judicial estoppel should take, requesting only that Plaintiff "should be judicially estopped in some form here."  (Doc. 90, ECF p. 29).  Further, we do not believe the standard Defendants employ is appropriate to a claim of judicial estoppel in this case.

"Judicial estoppel is a 'judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with one that [he or she] has previously asserted in

the same or in a previous proceeding.'" *Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 272 (3d Cir. 2012)(quoted case omitted). Defendants would apply the standard used in *Detz v. Greiner Industries, Inc.*, 346 F.3d 109 (3d Cir. 2003)(quoting *Cleveland v. Policy Mgmt. Sys. Corp.,* 526 U.S. 795, 807 (1999)). That standard would require Plaintiff to explain any inconsistency between her position in this case and one she might have taken in her worker's compensation case. However, *Detz* is distinguishable because the standard the court employed there was applied when the plaintiff had succeeded in having a court or agency accept the position inconsistent with the one now being presented and the plaintiff was benefitted by that acceptance. *Detz*, 346 F.3d at 117-18 & 118 n.2. In this case, Plaintiff did not prevail (and hence did not benefit from her statements) in her worker's compensation case, at least at the time of Defendants' summary judgment motion, since her application had been denied. (Doc. 91, Defendants' statement of material fact ¶ 108, citing Doc. 91-34).

In these circumstances, the "traditional three step 'judicial estoppel' approach" is employed. *Detz*, 346 F.3d at 117 & 118 n.2. Under that approach:

> Judicial estoppel may be imposed only if: (1) the party to be estopped is asserting a position that is irreconcilably inconsistent with one he or she asserted in a prior proceeding; (2) the party changed his or her position in bad faith, i.e., in a culpable manner threatening to the court's authority or integrity; and (3) the use of judicial estoppel is tailored to address the affront to the court's authority or integrity.

*Montrose Med. Grp. Participating Saving Plan v. Bulger*, 243 F.3d 773, 777 (3d Cir. 2001).  Defendants have not employed this traditional standard, so we are reluctant to rule on their judicial estoppel claim at this time.

VI.    *Conclusion*

Based on the foregoing, we will vacate our order granting summary judgment on: (1) the discharge claims under the Equal Protection Clause of the Fourteenth Amendment, Title VII, and PHRA; and (2) the retaliation claim.  We will deny Plaintiff's motion to vacate our order on: (1) the quid pro quo claim; (2) the defamation claim; and (3) the equal pay claim.[6]

/s/William W. Caldwell
William W. Caldwell
United States District Judge

Date: January 11, 2018

_____

[6]  Plaintiff requested oral argument, but we see no need for oral argument, so we will deny this request.